## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | | |
|---|---|---|
| BOGGS CONTRACTING, INC., | ) | |
| BOGGS MATERIALS, INC., | ) | |
| BOGGS TRANSPORT, INC., | ) | |
| DAVID C. BOGGS, | ) | |
| CARL A. BOGGS III, | ) | |
| KEVIN J. HAYES, JR., in his capacity | ) | |
| as trustee of The Lynches River Trust, | ) | |
| and KEVIN J. HAYES, JR., | ) | |
| in his capacity as trustee of | ) | |
| The David C. Boggs Family | ) | |
| Dynasty Trust, | ) | Case No. 6:21-cv-02088 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BERNARD FREISMUTH and | ) | |
| BSS&K CONSULTING, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR TEMPORARY RESTRAINING ORDER,
## EXPEDITED FORENSIC DISCOVERY, AND PRELIMINARY INJUNCTION
## WITH SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 65 and this Court's Local Rules

6.01 and 6.02, Plaintiffs respectfully move on an expedited basis for the issuance of a

temporary restraining order and preliminary injunction enjoining Defendants' conduct

to preserve the status quo, as well as an order permitting Plaintiffs to engage in limited

forensic discovery necessary to identify and recover their confidential and trade secret

information from Defendants. In support of this Motion, Plaintiffs rely on their

supporting memorandum of law set forth below and the Declarations and other

exhibits filed with this Motion. Unless the requested relief is granted, Plaintiffs will suffer further irreparable harm for which there is no adequate remedy at law. Plaintiffs have demonstrated good cause for expedited discovery, the likelihood of Plaintiffs' success on the merits of their claims are substantial, the balance of any hardships weighs in Plaintiffs' favor, and the requested injunctive relief would have no adverse effect on the public interest. For these reasons, this Court should grant Plaintiffs' requests in all respects. Proposed orders are attached hereto.

## INTRODUCTION

Defendant Freismuth is the former President of Plaintiff Boggs Contracting, Inc., and Defendant BSS&K Consulting, Inc. is Freismuth's consulting firm. This case is about Defendants' refusal to return Plaintiffs' most valuable and highly confidential information and trade secrets following their termination. Defendants have admitted—in writing—that they continue to possess Plaintiffs' data and information, but they have obstructed Plaintiffs' extensive efforts to recover it without litigation.

Defendants have even intentionally destroyed key evidence to hide their unlawful actions and prevent Plaintiffs from recovering their data. Defendants spoliated this key evidence despite knowing they had clear legal obligations to preserve the very evidence they destroyed. Defendants have also repeatedly provided misleading or outright false explanations for their conduct. Defendants have left Plaintiffs no choice but to file this lawsuit to seek appropriate equitable and injunctive relief—Defendants have shown they will not cooperate without court orders.

Defendants' conduct violates the confidentiality and other provisions of the

Shareholder Agreements they entered with Plaintiffs. Defendants' conduct violates the federal Defend Trade Secrets Act and the Florida Uniform Trade Secrets Act. Defendants' actions also constitute unlawful conversion of Plaintiffs' property in violation of Florida law.

Plaintiffs thus ask the Court to: (1) enter a Temporary Restraining Order which requires Defendants to preserve and not transfer, alter, or destroy any data stored on all devices and accounts in their possession, custody, or control capable of electronically storing data (to include computers, cell phones, external storage devices, e-mail accounts, etc.) during the pendency of this litigation; (2) permit Plaintiffs to conduct targeted and expedited forensic discovery into Defendants' devices and accounts to determine the full scope and nature of Defendants' activities regarding Plaintiffs' confidential and trade secret information, and to identify all such information and data in their possession; and (3) enter a Preliminary Injunction requiring Defendants to return all of Plaintiffs' confidential and trade secret information in a forensically sound manner. Plaintiffs have met their burdens justifying each of these requests.

**FACTS**

***The Boggs Companies***

Boggs Paving, Inc. ("BPI") was founded in 1994 by brothers Drew and Chris Boggs. (Hayes Dec. ¶ 3.[1]) Since then, the Boggs have grown their business into one of

---

[1] The Declaration of Plaintiff Kevin "JR" J. Hayes, Jr. is attached as Exhibit 1.

3

the largest privately held commercial and public road construction companies in the Carolinas, handling road construction projects involving everything from runways, highways, bridges, and intersections to parking lots and sidewalks—projects costing thousands of dollars to hundreds of millions. (*Id.*) The companies' operations have become divided across various corporate entities over time, including (but not limited to) BCI, BMI, and BTI. (*Id.* ¶ 4.) The companies employ several hundred people. (*Id.*)

The Boggs companies use Google's G Suite package of products as their e-mail and document management solutions. (Belk Dec. ¶ 3.[2]) To maintain the confidentiality of their confidential information and trade secrets through their IT systems, the Boggs companies enabled the following features: (a) password and administrative restrictions for all company e-mail accounts and company documents stored in their cloud-based servers; (b) restriction of access to confidential data to individuals on a "need-to-know basis"; and (c) by enabling two-factor authentication for company accounts. (*Id.*) Most, if not all, Boggs companies' employees who have access to the companies' confidential data and documents are required to sign agreements containing confidentiality restrictions to protect such information. (Hayes Dec. ¶ 10.)

### *The Hiring of Defendants*

In approximately January 2016, Chris Boggs contacted Freismuth and the two engaged in discussions about Freismuth possibly joining the Boggs companies in some capacity based on his experience in the surety industry. (*Id.*) Freismuth was ultimately

---

[2] The Declaration of the Boggs companies' IT consultant, Tony Belk, is attached as Exhibit 2.

engaged as a consultant for the Boggs companies through his company, BSS&K Consulting, Inc., which is an S-corporation owned by Freismuth and based in Florida. Freismuth insisted and required that he only be engaged through BSS&K, his S-corporation, rather than be an employee of the Boggs companies. (*Id.* ¶ 6.)

### The Shareholder Agreements

To ensure that key Boggs employees felt invested in their work with the companies, in 2015 and 2016—before discussions with Freismuth took place—several key employees were granted stock in various Boggs entities. (*Id.* ¶ 7.) When Freismuth joined later, he was included in this opportunity. (*Id.*) Freismuth performed well overall for the Boggs companies as a consultant, and on or about March 1, 2017, Freismuth (by and through BSS&K) was given the title of President of BCI. (*Id.*) In exchange for entering into certain stock purchase agreements funded with promissory notes, Freismuth entered into Shareholder Agreements with BCI, BTI, and BMI, becoming a minority shareholder in those companies.[3] (*Id.* ¶ 9.). Each of the Shareholder Agreements contain the following provision regarding confidentiality:

> Investor Shareholder hereby covenants and agrees that, as to Confidential Information, at all times, and as to Trade Secrets, for such time as the same shall constitute a Trade Secret under applicable law, Investor Shareholder will not, other than as necessary or appropriate in connection with his provision of services to the Company in the normal course of employment/investment or other than as may be approved by the Company in writing, either directly or indirectly, use, distribute, sell, license, transfer, assign, disclose, appropriate or otherwise communicate any Trade Secrets or Confidential Information to any Person, nor shall Investor Shareholder make use of any such Trade Secrets or Confidential Information for his own purposes or for the benefit of any other Person. Investor Shareholder shall immediately notify the Company of any intended or unintended, unauthorized disclosure or use of any Trade Secrets or

---

[3] Copies of the Shareholder Agreements are attached to Hayes' Declaration as Attachments 1–3.

> Confidential Information by Investor Shareholder or any other Person of which Investor Shareholder becomes aware.  Investor Shareholder shall cooperate fully with the Company in the protection of the Company's rights in any Trade Secrets and Confidential Information.

(S'holder Agr. for BCI and BMI § 5.02(a); BTI § 11.02(a).) Each of the Agreements also contain the following provision regarding breach of the confidentiality provisions:

> Investor Shareholder acknowledges that a breach of any of the covenants contained in this Agreement may cause irreparable damage to the Company, the exact amount of which will be difficult to ascertain, and that the remedies at law for any such breach will be inadequate. Accordingly, Investor Shareholder agrees that if Investor Shareholder is in breach of or threatens to violate any covenant contained in this Agreement, in addition to any other remedy that may be available at law or in equity, the Company shall be entitled to specific performance and injunctive relief, and Investor Shareholder hereby waives any defense that the company would have an adequate remedy at law.

(S'holder Agr. for BCI and BMI § 5.05; BTI § 11.05.)

> Further:

> Each Shareholder further agrees that all other Shareholders, in addition to any other remedy to which they may be entitled at law or in equity, shall be entitled to compel specific performance of this Agreement and to obtain injunctive relief in any action instituted in a court of proper jurisdiction.

(S'holder Agr. for BCI and BMI § 6.05; BTI § 12.05.)

Throughout their engagement with the Boggs companies, Defendants had access to the most highly confidential information data, documents, communications, and other materials belonging to Plaintiffs. (Hayes Dec. ¶ 11.) The access to this information was given to Defendants based upon their roles as fiduciaries of Plaintiffs and because Defendants had agreed to be bound by the confidentiality provisions contained within the Shareholders Agreements. (*Id.*)

6

*Defendants' Termination for Cause*

Although Freismuth's work performance was generally good, Freismuth operated in an extremely aggressive manner, a manner best described as "a bull in a china shop." (*Id.* ¶ 12.) For example, while performing services for the Boggs companies, Freismuth got into at least one physical altercation on a job site (which reportedly included the drawing of weapons). (*Id.*) He employed a "scorched earth" strategy in his dealings with everyone from company vendors to employees and everyone in between. (*Id.*) As his antics became more hostile, the Boggs companies became increasingly concerned about Freismuth's ability to effectively serve as a leader. (*Id.*) Additionally, Defendants defaulted on the promissory note for the purchase of their BCI shares, so it became unclear whether Freismuth remained interested in staying with the Boggs companies. (*Id.* ¶ 14.)

Thus, Drew and Chris Boggs approached Freismuth in early 2021 and discussed with him his plans and the next phase for the Boggs companies, essentially asking Freismuth what he wanted to do. (*Id.* ¶ 15.) He was offered a special projects role with the Boggs companies in which Freismuth would consult on various company projects on an ongoing basis. (*Id.*) Freismuth reacted negatively to the Boggs' overtures but nevertheless agreed to ongoing discussions. (*Id.*) But the discussions went nowhere and BCI ultimately named Will Duke as its new President on March 15. (*Id.* ¶ 16.) The parties continued to engage in **extensive** discussions around redeeming Defendants out of their shareholder interests reach an amicable agreement. (*Id.*) Freismuth approached the negotiations with unneeded aggression, making

unreasonable demands supported in neither fact nor logic and threatening to disparage Drew and Chris Boggs personally and the Boggs companies if they did not meet his demands. (*Id.* ¶ 17.) Nevertheless, Defendants' engagement with the companies continued.[4] (*Id.* ¶ 18.) It was then discovered that Defendants had engaged in conduct warranting their termination for Cause under the Shareholder Agreements. (*Id.* ¶ 20.) On July 9,[5] Defendants were provided written notice of their termination.[6] (*Id.* ¶ 21.)

### *Refusal to Return Company-Owned Laptop and Company Data*

In the July 9 termination letter to Defendants, Plaintiffs demanded they return and not retain **all** company property, which included "information, property, data, files, [and] computers … whether tangible or electronic." The letter further stated: "You are reminded of your continuing obligations to the Companies, including without limitation, the confidentiality, ownership, and non-solicitation obligations set forth in Section 5.02 of the Shareholders Agreements."[7] On July 20, Plaintiffs followed up with Defendants, asking them to return all company property, including Freismuth's company-owned laptop.[8] Later that day (July 20), Freismuth returned his company truck and other property (keys, etc.) to Will Duke, and he also gave Duke

---

[4] Defendants remained full-time consultants for the companies, and their full consulting fees continued to be paid in the same amount and on the same schedule as before. (*Id.*)

[5] All dates herein refer to the year 2021 unless otherwise noted.

[6] The parties were ultimately unable to reach an amicable agreement on the terms of the redemption of Defendants' shareholder interests in the Boggs companies, and so, as described below, those claims have been submitted to arbitration before the AAA. (*Id.* ¶ 19.)

[7] A redacted copy of the termination letter is attached hereto as Exhibit 3. The portions of the letter discussing Freismuth's termination and the negotiations around the redemption of his shares have been redacted because those issues are confidential and irrelevant to this Motion.

[8] A copy of that e-mail is attached as Exhibit 4.

an external hard drive. (Duke Dec. ¶ 2.[9]) Freismuth did not return his company-owned laptop. (*See id.*[10])

Plaintiffs thus demanded on July 21 the return of the laptop.[11] Defendants did not respond. On July 26, Plaintiffs again demanded the laptop.[12] Defendants responded later that day: "The computer is not the property of any Boggs entity," and, "**All** files related to the Boggs' entities were maintained on a separate hard drive that has been returned." (Emphasis added.)[13] On July 27, Plaintiffs explained the computer was purchased with company funds for the performance of work on behalf of the companies, also stating, "We also have reason to believe the company laptop contains confidential information, which [Freismuth] is obligated to return."[14] Defendants did not respond. Plaintiffs also sent a letter to Defendants on July 27, which opens by stating:

> [Freismuth] is required to return all Company property. As we have discussed via email, [Freismuth] is still in possession of his Company-purchased, issued and owned laptop, which contains confidential and proprietary information of the Companies. Please have [Freismuth] return his laptop and any other Company information or property immediately. **[Freismuth] is also prohibited from deleting or transferring any Company information on such laptop.**

---

[9] The Declaration of Will Duke is attached as Exhibit 5.

[10] Included as Attachment 1 to Duke's Declaration is a list of items Freismuth returned signed by Duke and Freismuth.

[11] A copy of this e-mail is attached as Exhibit 6.

[12] A copy of this e-mail is attached as Exhibit 7.

[13] A copy of this e-mail is attached as Exhibit 8. As explained below, this latter statement was later proven false through Plaintiffs' forensic investigation.

[14] A copy of this e-mail is attached as Exhibit 9. The credit card statement identifying the laptop purchase was attached.

(Emphasis added.)[15] Defendants did not respond.

On August 3, Plaintiffs sent another letter to Defendants, stating: "[Freismuth] is again demanded to immediately return the BCI laptop purchased with BCI funds and owned by BCI."[16] On August 8, Defendants responded but made no mention of the laptop or Plaintiffs' data or information. Plaintiffs sent another letter August 13: "[Freismuth] is demanded to immediately return the laptop which contains the Companies' confidential and proprietary information."[17] Defendants did not respond. Instead, on September 3, Freismuth sent a copy of his Demand for Arbitration which he would "be filing with the AAA next week." Neither the Demand for Arbitration nor the e-mail mentioned the laptop or Plaintiffs' data or information.[18] Freismuth filed his Demand for Arbitration regarding his termination on September 16.[19]

### The Destruction of Evidence

Defendants' communications made it clear they did not intend to return the laptop or the any confidential and trade secret data they possessed. On September 24, Plaintiffs demanded—yet again—that Defendants return the laptop and data. The letter outlined all prior attempts to secure same and threatened to seek injunctive relief

---

[15] A redacted copy of the first page of this letter is attached as Exhibit 10. The remainder of the letter contains communications regarding Defendants' termination not relevant to the issues presented by this Motion.

[16] A redacted copy of the final page of this letter is attached as Exhibit 11. The remainder of the letter contains communications regarding Defendants' termination not relevant to the issues presented by this Motion.

[17] A redacted copy of the final page of this letter is attached as Exhibit 12. The remainder of the letter contains communications regarding Defendants' termination not relevant to the issues presented by this Motion.

[18] A copy of this e-mail is attached as Exhibit 13.

[19] The arbitration is pending with the AAA, but the parties are very early in the litigation. The parties have not yet selected their panel of arbitrators as of the date of this filing.

"to ensure that all confidential and trade secret information belonging to the Boggs Companies has not been further transferred, accessed, or otherwise misappropriated by Mr. Freismuth."[20]

The September 24 letter was sent via e-mail by the undersigned at **3:03 p.m. ET**.[21] ***One minute later,* at 3:04 p.m. ET**, Freismuth telephoned BCI's President, Will Duke, leaving a voicemail about returning the laptop. (Duke Dec. ¶ 3.[22]) This was the first time Freismuth contacted Plaintiffs' representatives about the laptop. (*Id.*) Then, **at 4:39 p.m. ET**, Defendants responded to Plaintiffs' letter, stating:

> [Freismuth] was already in touch with Will Duke about returning the computer <u>prior to receiving your letter</u>, which I hope he can do over the weekend. Again, curious timing on your client's part.
>
> We are a bit puzzled over what company confidential and trade secrets that you believe may have existed on this laptop. **My client already tendered <u>all</u> Boggs files over to your client on July 20 on an external hard drive, and I understand none of those were kept on the laptop.** Let me know if we still need to discuss anything about the laptop. Again, my client has already been in contact with Will Duke about returning it.

(Emphasis added.)[23]

**<u>At 4:57 p.m. ET</u>, a mere 18 minutes later, Defendants manually erased all the laptop's data using the device's push button reset function.** (Clarke Dec. ¶ 9.[24]) This erased not only all user type files on the device (e.g., Word documents, spreadsheets, locally-stored e-mails, PDFs, etc.), but also all forensic data which would

---

[20] A copy of this letter is attached as Exhibit 14.
[21] The e-mail sending the letter and showing this timestamp is attached as Exhibit 15.
[22] A screenshot from Duke's cell phone showing the timestamp of the call from Freismuth is included in Duke's Declaration.
[23] A copy of this e-mail is attached as Exhibit 16.
[24] The Declaration of Kevin Clarke, Plaintiffs' digital forensics expert, is attached as Exhibit 18.

detail user activity on the laptop, including file access and deletion activity by a user. (*Id.*) The resetting of the laptop in this way prevents even a digital forensic specialist from recovering data from the device. (*Id.*) Not knowing Defendants had already deleted all data on the laptop, Plaintiffs responded to Defendants at 7:17 p.m. ET, explaining, "Although I am sure it goes without saying, your client is under an obligation (and has been for quite some time) to preserve all data contained on the laptop."[25] On September 26 Freismuth returned the laptop to Plaintiffs.

All told, Plaintiffs demanded return of the laptop and all company data a total of **<u>nine</u>** times in writing and repeatedly advised Defendants of their duty to preserve all data on the device before it was returned with all data deleted.

### *The Forensic Findings*

Once the laptop was received, it and the external hard drive were submitted to Plaintiffs' digital forensics expert for analysis. The expert's findings, as reviewed by Plaintiffs, shows: (a) the external hard drive contains more than 40,000 user files, many of which contain or constitute Plaintiffs' most highly confidential and trade secret information; (b) that more than 3,000 of those files were copied to the external hard drive on July 16 just a few days before it was given the Plaintiffs; and (c) that the laptop was manually reset on September 24 at 4:57 p.m. ET which erased all meaningful data on the device. (*Id.* ¶¶ 5, 9.) There is no way to determine from forensically analyzing the external drive where the files on the drive originated—in other words, there is no

---

[25] A copy of this e-mail is attached as Exhibit 17.

way to know if Defendants copied them from the company-owned laptop or from some other device which still contains some or all of the files. (*Id.* ¶¶ 9–11.)

However, this evidence does conclusively establish that Defendants' statement on July 26 that "All files related to the Boggs' entities were maintained on a separate hard drive" (Ex. 8) was not true because more than 3,000 of the companies' most highly confidential and trade secret materials were not copied onto the drive until July 16, mere days before the drive was given to Plaintiffs. It was thus not a true statement to say that Defendants only maintained Plaintiffs' files on the external drive—because they weren't copied to that drive from some other device until almost two weeks after Defendants' termination.

With respect to the files found on the external drive, they constitute some of the Boggs companies' most highly confidential and trade secret documents. (Hayes Dec. ¶ 23.) For example, there is a folder titled "Financials" containing audited financial statements, tax returns, balance sheets, and bank and credit statements and documents, among many others. (*Id.*) There is also a folder titled "Bids & wins" containing extremely detailed bidding information for dozens of company projects. (*Id.*) The companies' financial and bidding information is, without a doubt, the most highly sensitive, confidential, and competitively valuable information for the Boggs companies. (*Id.*) It is nothing short of the Boggs' companies' "secret sauce." Were this information to end up in the hands of a competitor, the Boggs companies would be at a serious disadvantage in the marketplace and would be irreparably damaged as a result. (*Id.*)

***Plaintiffs' Final Attempt to Recover Their Data and Documents***

Following a failed attempt at mediation on November 30,[26] Plaintiffs demanded on December 2 that Defendants identify and produce Freismuth's electronic storage devices and accounts for forensic inspection by Plaintiffs' expert to determine to what extent Freismuth is still in possession of Plaintiffs' confidential and trade secret data.[27] Defendants' December 3 response admits they possess Plaintiffs' confidential data, stating they have "records which are the subject of the arbitration and would be discoverable in that forum."[28] This statement **directly contradicts** Defendants' prior representations on July 26 and September 24 that **all** of Plaintiffs' data and documents had been returned. The letter goes on to state that "Prior to receiving your letter that was e-mailed to me at 3:03 p.m. ET on September 24, Freismuth had already deleted the personal files he maintained on the laptop in preparation for returning it to Mr. Duke." This statement **directly contradicts** the irrefutable forensic evidence that the files on the laptop were not deleted until almost two hours **after** the undersigned's September 24 communication sent at 3:03 p.m. ET.

---

[26] On October 15, the undersigned spoke with Defendants' counsel and outlined the forensic findings from Plaintiffs' expert. (Gibbs Dec. ¶ 2.[26]) The undersigned explained Plaintiffs planned to pursue claims against Defendants based on those findings. (*Id.*) However, the parties agreed to mediate all claims and disputes between them, to include Plaintiffs' claims regarding their confidential and trade secret information. Plaintiffs thus decided to try and resolve their claims through mediation prior to inflaming passions with the filing of this lawsuit. The parties scheduled a mediation for November 30 in Charlotte, North Carolina. (*Id.*) The undersigned spoke with Defendants' counsel on November 3 and again explained the forensic findings and asked for an explanation regarding the deletion of data from the laptop; the transfer of files to the external hard drive; and whether Defendants were still in possession of any confidential and trade secret data. (*Id.*) There was no follow up on these issues. (*Id.*) The parties were unable to resolve their claims at the November 30 mediation. (*Id.*)

[27] A copy of this letter is attached as Exhibit 19. Plaintiffs agreed to a confidentiality agreement for this process.

[28] A copy of this letter is attached as Exhibit 20.

Plaintiffs are thus left with no choice but to file this Motion to preserve the status quo based on: (a) Defendants' deletion of key evidence despite legal obligations and demands not to do so; (b) their staunch refusals to return Plaintiffs' confidential and trade secret data while admitting (in writing) they are in possession of it; and (c) Defendants' inconsistent and incorrect explanations of their conduct as refuted by undeniable forensic evidence.

## ARGUMENT AND CITATIONS TO AUTHORITY

### I.  Applicable Standards.[29]

The purpose of a temporary restraining order ("TRO") and preliminary injunction is "to maintain the status quo until the requisite notice may be given and an opportunity is afforded to opposing parties to respond to the application for a preliminary injunction," *Talk Fusion, Inc. v. Burling*, 2016 WL 9132932, at *2 (M.D. Fla. June 29, 2016), and "until the court can enter a final decision on the merits of the case." *MicroLumen, Inc. v. Allegrati*, 2007 WL 9757950, at *4 (M.D. Fla. Aug. 31, 2007).   The same standards apply to applications for TROs and preliminary injunctions. *See Kotori Designs, LLC v. Living Well Spending Less, Inc.*, 2016 WL

---

[29] Courts, including the Eleventh Circuit, have held that a party may seek injunctive relief in a court of proper jurisdiction while an arbitration is pending if the agreement at issue contains a clear, express provision allowing such relief. *American Exp. Financial Advisors, Inc. v. Makarewicz*, 122 F.3d 936, 940–41 (11th Cir. 1997); *see also UBS Painwebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 441 (W.D.N.C. 2002) ("Under the terms of the [agreement at issue], [Plaintiff] reserved the right to seek preliminary injunctive relief from a court of competent jurisdiction. District courts have jurisdiction to enter preliminary injunctive relief despite the fact that the case is subject to binding arbitration."). Here, the Shareholder Agreements provide that each party to the Agreement, "in addition to any other remedy to which [a party] may be entitled at law or in equity, shall be entitled to compel specific performance of this Agreement and to obtain injunctive relief in any action instituted in a court of proper jurisdiction." (S'holder Agr. for BCI and BMI § 6.03(a); BTI § 12.03(a).) Thus, based on this express provision, Plaintiffs hereby seek injunctive relief before this "court of proper jurisdiction."

6833004, at *2 (M.D. Fla. Nov. 21, 2016). Namely, a plaintiff must establish: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunctive relief is issued; (3) that the threatened injury to the moving party outweighs whatever damage might cause the non-moving party if the injunctive relief is granted; and (4) that granting the injunctive relief sought serves the public interest. *Id.*; *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 774 (11th Cir. 2015). Plaintiffs meet these four elements.

## II.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

The first element—substantial likelihood of success on the merits—"is generally the most important." *CiCi Enter., LP v. Four Word Motion, LLC*, 2016 WL 9244626, at *3 (M.D. Fla. Oct. 17, 2016). "A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success." *Id.*

### A.    Plaintiffs Are Likely to Succeed on Their Breach of Contract Claim.

North Carolina law applies in evaluating Plaintiffs' breach of contract claim.[30] The elements for a breach of contract claim are: "(1) [the] existence of a valid contract and (2) breach of the terms of that contract." *Superior Performers, Inc. v. Meaike*,

---

[30] The Shareholder Agreements each contain a North Carolina choice-of-law provision, stating: the "laws of the State of North Carolina . . . shall govern the interpretation, validity and performance of the terms of this Agreement." (S'holder Agr. for BCI and BMI § 6.07; BTI § 12.07.) Florida courts "will generally enforce choice-of-law provisions unless the law of the chosen forum contravenes strong public policy." *Godwin Pumps of Am., Inc. v. Ramer*, 2011 WL 2670191, at *3 (M.D. Fla. July 8, 2011). However, Florida law applies to Plaintiffs' other claims. *Rodriguez v. JPay, Inc.*, 2019 WL 11624312, at *3 (S.D. Fla. Oct. 21, 2019) (explaining that "federal courts apply the law of the forum state to claims not covered by an express choice of law provision"). Here, the choice of law provisions only apply to "the interpretation, validity and performance of the terms of this Agreement." (S'holder Agr. for BCI and BMI § 6.07; BTI § 12.07.)

2014 WL 1412434, at *5 (M.D.N.C. Apr. 11, 2014). When construing contractual terms, the contract's plain language controls. *See State v. Phillip Morris USA, Inc.*, 363 N.C. 623, 631–33 (2009). A confidentiality provision in an agreement is enforceable "if it does not seek to prevent a party from engaging in a similar business in competition with the [employer], but instead seeks to prevent the disclosure or use of confidential information." *Eye Dialogue LLC v. Party Reflections, Inc.*, 2020 WL 4334810, at *6 (N.C. Super. Ct. July 28, 2020). To be enforceable, therefore, such a provision need only "a showing that it protects a legitimate business interest of the [employer]," even if the agreement is unlimited as to geography and time. *Chemimetals*, 124 N.C. App. at 197.

Here, Defendants entered into valid and binding contracts supported by adequate consideration: in exchange for entering into stock purchase agreements funded with promissory notes and becoming a shareholder of the companies, Freismuth entered into a Shareholder Agreement with BCI and BSS&K entered into practically identical agreements with BTI and BMI. Thus, valid contracts exist. Plaintiffs have also established that Defendants have breached the agreements in two respects. First, Defendants promised in each of the Shareholder Agreements that they "shall cooperate fully with [Plaintiffs] in the protection of [Plaintiffs'] rights in any Trade Secrets and Confidential Information" (S'holder Agr. for BCI and BMI § 5.02(a) BTI § 11.02(a)), which certainly includes an obligation that they return such information and data upon request by Plaintiffs. But Plaintiffs have breached the contracts by refusing every request to do so despite their contractual obligation while

17

admitting—in writing—that they continue to possess Plaintiffs' confidential information and trade secrets. (*See* Ex. 21, stating that Defendants have "records which are the subject of the arbitration and would be discoverable in that forum.")

Second, all signs indicate that Defendants have used, distributed, transferred, disclosed, appropriated, or disclosed Plaintiffs' confidential information and trade secrets, or plan to do so, in violation of the agreements' prohibition against such actions. (S'holder Agr. for BCI and BMI § 5.02(a) BTI § 11.02(a).) Defendants' most telling conduct is the deletion of the data on the laptop. There is no reason for Defendants to have deleted all data on that device besides obstructing Plaintiffs' investigation into their actions.[31] There is simply no justification for their conduct other than to hide their bad acts, and Defendants should not be able to use their intentional deletion of evidence showing their breach of the Shareholder Agreements to avoid culpability. Based on these facts, Plaintiffs have established a likelihood of success on their breach of contract claim. *See Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 915 (4th Cir. 1997) (upholding injunctive relief for a breach of confidentiality claim where former employee was enjoined from disclosing confidential information to third parties and was ordered to return all confidential materials).

### B.   Plaintiffs Are Likely to Succeed on Their Conversion Claim.

"Under Florida law, conversion is an unauthorized act which deprives another

---

[31] This is especially true since Plaintiffs specifically told Defendants, in writing, that they would protect Defendants' privacy with respect to any personal data maintained on the laptop. (Ex. 14 p. 2.)

of his property permanently or for an indefinite time. Acquisition of the property is unimportant. The essence of the tort of conversion is a party's refusal to surrender the property after demand has been made." *Imagine Comm. Corp. v. Villegas*, 2017 WL 2304013, at *6 (S.D. Fla. May 19, 2017).

Defendants refused to return Plaintiffs' laptop containing their confidential information and trade secrets despite numerous attempts by Plaintiffs to retrieve it. Further, about **two hours after** having been expressly instructed in writing by Plaintiffs' counsel to preserve all evidence in this case, including data on the company-issued laptop, Defendants deleted or caused to be deleted (a) Plaintiffs' files from the company laptop which Defendants used to unlawfully retain Plaintiffs' confidential and trade secret information prior to leaving their engagement with Plaintiffs; and (b) all forensic data on the laptop that could be used to track the use and/or distribution of Plaintiffs' confidential and trade secret information. Plaintiffs' forensic expert has testified that all data on the laptop was deleted and is permanently unrecoverable. (Clarke Dec. ¶ 9.) Simply put, Defendants have converted Plaintiffs' property "by taking, downloading, and copying" Plaintiffs' files and data without authorization, depriving Plaintiffs of the benefits thereof. *Imagine*, 2017 WL 2304013, at *6. Plaintiffs have thus shown a likelihood of success on their conversion claim.

## C.     Plaintiffs Are Likely to Succeed on Their Misappropriation Claims.

The federal Defend Trade Secrets Act ("DTSA") and the Florida Uniform Trade Secrets Act ("FUTSA") create private causes of action for the misappropriation of trade secrets. Prohibited misappropriation under both statutes includes the

acquisition of a trade secret and its disclosure or use. 18 U.S.C. § 1839(5); Fla. Stat. § 688.002(2). Both statutes define "trade secrets" similarly as information that derives economic value from not being generally known to or readily ascertainable through proper means by another person, and that is subject to reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839(3); Fla. Stat. § 688.002(4). Both statutes permit a court to enjoin either actual or threatened misappropriation of trade secrets during the pendency of an action. 18 U.S.C. § 1836(b)(3)(A); Fla. Stat. § 688.003(1).

Defendants have admitted to having in their possession Plaintiffs' data and information, which Plaintiffs have taken reasonable and appropriate steps to protect its secrecy as detailed above. This information includes, but is not limited to, audited financial statements, tax returns, balance sheets, and bank and credit statements and documents, as well as detailed bidding information. After having access to and taking Plaintiffs' confidential and trade secret information following the termination of their engagement with Plaintiffs, Defendants refused to return the data. At minimum, their failure to immediately return the laptop "provide[s] strong evidence of his intent to wrongfully obtain [Plaintiffs'] secret information." *Autonation, Inc. v. Peters*, 2016 WL 1722365, at *4 (S.D. Fla. Apr. 29, 2016).[32]   Further highlighting Defendants' improper conduct, Defendants deleted all data on the company-issued laptop.

---

[32] Defendants' refusal to return the laptop and subsequent deletion of key evidence clearly shows that Defendants knew or had reason to know Plaintiffs' confidential and trade secret information was acquired by improper means. *See VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp.2d 1349, 1361–63 (S.D. Fla. 2012) (where defendant refused to return documents upon request, downloaded plaintiff's confidential information to a thumb drive, and then deleted hard copies of such information, finding that plaintiff has demonstrated a substantial likelihood of success on the merits of misappropriation of trade secrets claim).

Defendants' refusal to return the laptop and subsequent deletion of key evidence clearly shows that Defendants knew or had reason to know Plaintiffs' confidential and trade secret information was acquired by improper means. *See VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp.2d 1349, 1361–63 (S.D. Fla. 2012) (where defendant refused to return documents upon request, downloaded plaintiff's confidential information to a thumb drive, and then deleted hard copies of such information, finding that plaintiff has demonstrated a substantial likelihood of success on the merits of misappropriation of trade secrets claim). Thus, Plaintiffs have demonstrated a likelihood of success on their misappropriation claims.

### III.   Plaintiffs Have Suffered and Will Suffer Further Irreparable Harm.

Spoliation constitutes irreparable harm in and of itself: "irreparable harm will result from ongoing violations of law and inequitable conduct by Defendants and others acting in concert with them, including but not limited to the spoliation of evidence." *Amazon.com, Inc. v. WDC Holdings LLC*, 2020 WL 4720086, at *2 (E.D. Va. June 5, 2020). "Injunctive relief may be appropriate where the departing employee is not forthright as to his intentions." *Philips Electronics N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 723 (M.D.N.C. June 30, 2009). Defendants deleted the laptop's data despite being aware of their legal obligation to preserve all data, documents, and other materials on the laptop. This lost evidence, some of which are original documents that cannot be replaced, has impacted Plaintiffs' ability to prove their claims. *See NuVasive, Inc. v. Kormanis*, 2019 WL 1171486, at *11 (M.D.N.C. Mar. 13, 2019) (finding the lost ESI at issue was prejudicial because such information would have

supported plaintiff's position that defendant breached the restrictive covenants in his employment contract). Absent injunctive relief, further spoliation may well occur.

Additionally, "[i]n most instances, courts presume irreparable harm where a trade secret has been misappropriated." *Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1455 (M.D.N.C. 1996). Indeed, "[t]he very nature of a trade secret mandates that misappropriation will have significant and continuous long-term effects. The party wronged may forever lose its competitive business advantage or, at the least, a significant portion of its market share." *S.E. Mech. Servs., Inc. v. Brody*, 2008 WL 4613046, at *16 (M.D. Fla. Oct. 15, 2008). Defendants also breached the Shareholder Agreements by failing to return and misappropriating Plaintiffs' confidential and trade secret information. Their actions constitute irreparable harm. *See E.A. Renfroe & Co., Inc. v. Moran*, 249 F. App'x 88, 93 (11th Cir. 2007) (breach of confidentiality provision "established the threat of irreparable injury"); *CiCi Enterprises, LP v. Four Word Motion, LLC*, 2016 WL 9244626, at *10 (M.D. Fla. Oct. 17, 2016) ("Plaintiff also suffers irreparable injury due to Defendants' breach of the Confidentiality Covenant.").[33]

---

[33] Defendants' return of the external drive containing Plaintiffs' confidential information and trade secrets does not negate the irreparable injury to Plaintiffs. *See VAS Aero*, 860 F. Supp.2d at 1363 (finding that defendant's offer to return stolen documents "is insufficient to rebut [plaintiff's] showing that it would suffer irreparable injury given that defendant still has plaintiff's confidential documents in his possession"). It is still far from clear the extent of the documents and data Defendants have in their possession. Defendants' continued possession of Plaintiffs' confidential and trade secret information not only causes substantial loss in Plaintiffs' market share and future prospects, but it also "erodes and destroys customer[s'] expectations that the private financial information be protected by [Plaintiffs]." *UBS Painwebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 442 (W.D.N.C. 2002). Defendants' actions have caused and will continue to cause "irreparable harm." *Id.*

Accordingly, this Court must exercise its equitable powers to afford Plaintiffs an adequate remedy in this case. Plaintiffs seek injunctive relief "to preserve the status quo pending arbitration" before Defendants stole their confidential and trade secret information and before Defendants destroyed evidence. *See UBS*, 197 F. Supp. 2d at 448. Without this relief, Defendants unlawful conduct will continue to benefit them.

## IV. The Balance of the Equities Weighs in Plaintiffs' Favor.

The balancing of the harms weighs strongly in Plaintiffs' favor. Plaintiffs are the innocent party here. Their property was unlawfully misappropriated by Defendants for their own benefit, so Plaintiffs are asking only for restoration of the status quo. Defendants' "refusal to return [the company-issued laptop containing Plaintiffs' data and documents] to [Plaintiffs] after [Plaintiffs] demanded them forced [Plaintiffs] to turn to this Court for relief." *VAS Aero*, 860 F. Supp. 2d at 1363. Defendants' unlawful acts forfeited any reasonable expectation of equity, and granting the injunction would simply require Defendants to perform as they contractually obligated themselves to do. *See Autonation*, 2016 WL 1722365, at *5.

## V. Issuance of An Injunction Is in the Public Interest.

Finally, the public interest also favors Plaintiffs. "There is a public interest in enforcing the terms of a valid contract." *Waterfront*, 2011 WL 4715155, at *5; *see also Creative Snacks*, 2018 WL 1626522, at *7 (finding that "the public interest is served in enjoining Defendants because the public has an interest in ensuring that legitimate contracts are enforced." The public interest would also be served by "protecting businesses from [individuals] who misappropriate their trade secrets," *VAS Aero*, 860

F. Supp.2d at 1363, and by "preventing unethical business behavior," *Philips Elecs.*, 631 F. Supp. 2d at 724. Injunctive relief is thus in the public interest here.

## VI.  Limited Expedited Forensic Discovery Is Appropriate.

Courts in the Eleventh Circuit "have expressly used a general good cause standard" in evaluating expedited discovery motions. *E.g.*, *Rivera v. Parker*, 2020 WL 8258735, at *3 (N.D. Ga. Aug. 28, 2020) (internal quotation marks and citation omitted). Good cause may be found where there is "impelling urgency" or "hazard of loss" requiring action to be "taken forthwith." *Id.* Courts also consider the following factors: "(1) whether a motion for preliminary injunction is pending; (2) the breadth of the requested discovery; (3) the reason(s) for requesting expedited discovery; (4) the burden on the opponent to comply with the request for discovery; and (5) how far in advance of the typical discovery process the request is made." *Id.*

All factors weigh in favor of showing good cause here. First, concurrent with their motion for expedited forensic discovery, Plaintiffs have moved for a TRO and preliminary injunction, which is far in advance of the typical discovery process. Second, Plaintiffs have proof that Defendants have taken and maintained possession of their most highly confidential and trade secret data. Given Defendants' obfuscation of their activities, the extent of their conduct with respect to Plaintiffs' data has yet to be fully uncovered, and so Plaintiffs have no idea at this point what Defendants have done with their materials. Third, Plaintiffs' request is reasonable in scope given the circumstances. Plaintiffs ask that they be permitted to forensically evaluate Defendants' devices and accounts that they have used in the past year. This request is

24

narrowly tailored to allow Plaintiffs to determine the nature and extent of Defendants' activities regarding Plaintiffs' confidential information and trade secrets. Plaintiffs' request for expedited limited forensic discovery thus satisfies the good cause standard.

## VII.   No Bond Should Be Required.

A court may require no bond where the nonmoving party fails to demonstrate injury. "[T]he trial judge has wide discretion in the manner of requiring security and if there is an absence of proof showing the likelihood of harm, certainly no bond is necessary." *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964); *accord Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). Defendants will not be harmed by the relief requested, so no bond should be required.

### CONCLUSION

Plaintiffs respectfully request that the Court grant their requested relief for the reasons stated above.

Respectfully submitted this 13th day of December 2021.

/s/ John S. Gibbs III
John S. Gibbs III
Florida Bar No. 91102
evan.gibbs@troutman.com

TROUTMAN PEPPER
HAMILTON SANDERS LLP
600 Peachtree Street, NE
Suite 3000
Atlanta, GA  30308
(404) 885-3000 (phone)
(404) 962-6522 (facsimile)

Counsel for Plaintiffs

25